IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| DR. AWANNA LESLIE and<br>BETTYE RICHARDSON,<br><br>   Plaintiffs,<br><br>v.<br><br>HANCOCK COUNTY SCHOOL<br>DISTRICT,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO. 5:11-CV-497(MTT)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

Plaintiffs Dr. Awanna Leslie and Bettye Richardson assert claims against the Hancock County School District pursuant to 42 U.S.C. §§ 1983 and 1988. They allege the School District fired them in retaliation for their exercise of their First Amendment rights of free speech. Specifically, the Plaintiffs allege they were fired because they criticized the Hancock County Tax Commissioner, even though they spoke "in forums outside of the workplace" and their criticisms "did not concern the subject matter of their job." (Doc. 42 at 3). The School District has moved for summary judgment, contending that Plaintiffs "were acting and speaking explicitly (1) pursuant to the responsibilities imposed on them by law and job description to manage the fiscal affairs of the School District and (2) at the direction of their employer – the Board of Education – and in furtherance of the business and governance of the School District." (Doc. 33-1 at 5). Relying on *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the School District argues that because the Plaintiffs' speech was not made as citizens but rather as part of their

official responsibilities, their speech is not protected by the First Amendment.  The Court agrees.

## I.  BACKGROUND

Leslie and Richardson both held numerous teaching and administrative positions with the School District before applying for the position of superintendent for the 2006-2007 school year.  (Docs. 38 at 12:17-24:15; 39 at 9:1-17:14).  The Hancock County Board of Education offered Leslie the superintendent position and Richardson the position of assistant superintendent.  (Docs. 33-4 at 2; 39 at 19:11-21).  According to Leslie's contract, her responsibilities as superintendent included "assum[ing] responsibility for the overall financial planning of the school system" and acting as "a liaison between the school system and the community."  (Doc. 33-7 at 3).  Richardson testified her role as assistant superintendent "was to assist [Leslie] in her duties as needed."  (Doc. 39 at 20:14-24).

Leslie and Richardson both testified the School District had financial challenges during their tenure.  (Docs. 38 at 47:17-24; 39 at 24:25-26:20).  Both thought a major cause of the problem was that the School District received too little money from local tax revenue, a problem they blamed on the Hancock County Tax Commissioner.  (Docs. 38 at 47:20-48:23; 39 at 24:25-26:20).  Leslie asked the Board's attorney to write a letter to the Tax Commissioner addressing the fact that the "collection rate was very low … [a]nd that we needed our money to fund schools' activities and obligations."  (Doc. 38 at 75:14-20).  Leslie also believed that the Tax Commissioner distributed tax revenue in a "suspicious pattern," and she testified that this pattern was first identified by the School District's finance director.  (Doc. 38 at 66:18-69:13).  On August 14, 2009, Leslie

reported to the Board[1] that she was "in the process of obtaining a county audit to look for any improprieties in the tax office." (Doc. 38-1 at 10).

One of Leslie's duties was to prepare an annual budget for the School District and make recommendations to the Board regarding the tax digest and the millage rate necessary to produce the revenue the School District needed to operate within the proposed budget. (Docs. 38 at 86:15-87:20, 114:5-16; 34 at ¶ 26; 43 at ¶ 26). Because the "effective" millage rate necessary to produce adequate revenue would have to increase to fund Leslie's 2009 proposed budget, Georgia law required the School District to hold three public hearings. (Docs. 34 at ¶ 27; 43 at ¶ 27). This proved controversial and Leslie made presentations at some of these hearings to explain to the community the reasons for her budget and millage rate recommendations. (Docs. 34 at ¶ 28; 43 at ¶ 28; 38 at 87:9-88:8). The Tax Commissioner attended some of these meetings, and according to Leslie, he defended his tax collection efforts in one by stating that "not only had he given us the correct amount, he gave us more than we should have received." (Docs. 34 at ¶ 30; 43 at ¶ 30; 38 at 88:9-17). Also, Leslie questioned the Tax Commissioner in an effort to dispel rumors that she personally was accepting tax distribution checks from the Tax Commissioner's office. (Docs. 34 at ¶ 29; 43 at ¶ 29; 38 at 90:18-93:14).

At the direction of the Board, Leslie wrote a letter to Rev. Samuel Duggan, the chairman of the Hancock County Commission, to set up a meeting with the Tax Commissioner. (Docs. 38 at 95:24-96:17; 38-1 at 40). The October 29, 2009 letter reads:

---

[1] Leslie and Richardson separately reported to the Board in weekly "Friday letters," which summarized what each had done during the week. (Docs. 38 at 54:10-19; 39 at 21:23-22:19).

> As directed by the Chair of the Hancock County Board of Education, we will be very grateful to meet with you, the Commissioners and [the Tax Commissioner] on Monday, Tuesday, or Wednesday of next week. … For you to be properly prepared for this meeting, we are asking that [the Tax Commissioner] will [sic] present to us documentation of all monies given to the Hancock County Board of Education from July 1, 2006 – June 30, 2007, July 1, 2007 – June 30, 2008, July 1, 2008 – June 30, 2009, and June 30, 2009 – Present.  We are only trying to determine a solution to the obvious discrepancies in the accounting of funds between agencies.

(Doc. 38-1 at 40).  Leslie testified she had "about three or four meetings" with the commissioners, and had "[m]aybe two or three" meetings with the Tax Commissioner in his office or in her office.  (Doc. 38 at 77:12-78:22).  Leslie admitted she attended these meetings in her capacity as superintendent.  (Docs. 34 at ¶ 32; 43 at ¶ 32; 38 at 69:16-21).  During these meetings, Leslie was accompanied by members of the Board and other School District employees, many of whom were a part of what Leslie referred to as her "leadership team."[2]  (Doc. 38 at 49:4-24).

Both Leslie and Richardson reported to the Board about their meetings with the Tax Commissioner.  On November 6, 2009, Richardson informed the Board:

> Mr. Monroe, Dr. Leslie, Mrs. Behne, Ms. Davis, Mr. M. Jones, Mrs. Lester,[3] and I met with [the Tax Commissioner] to compare documentation to find the discrepancies between his figures and ours for the amount of tax monies he has given to the Hancock County Board of Education.  The matter was not resolved.  [The Tax Commissioner] will have this information to us by November 15 after he gets a copy of all canceled checks submitted to us from the bank.

(Doc. 38-2 at 42).  On November 20, 2009, Leslie informed the Board:

> Mrs. Richardson, Mrs. Behne, Mrs. Freeman, Mr. Matthias Jones and I went to the Tax Commissioner's Office and the County Commissioner's Office in reference to the documentation of taxes paid to the Hancock

---

[2] Leslie identified Richardson, Tina Behne, Diane Freeman, and Arlene Davis as members of her leadership team.  (Doc. 38 at 49:4-24).

[3] Yvonne Lester and Matthias Jones were School District employees and Herbert Monroe was Chairman of the Board.  (Doc. 38 at 91:3-6, 105:3-11).

> County Board of Education and the canceled checks that should have been provided as documentation of funds expended and received.

(Doc. 38-1 at 46-47). On December 4, 2009, Leslie informed the Board:

> We went to see [the Tax Commissioner] for him to sign that we could obtain documents relative to the money that he supposedly gave us. I carried his signature to the bank. The bank informed us that we need check dates and/or check numbers before they could research anything.

(Doc. 38-2 at 4). Finally, on January 22, 2010, Richardson informed the Board that "[w]e did not get all of the needed documentations from [the Tax Commissioner] to complete the comparison … of the tax money he says he gave us with what we received." (Doc. 39-1 at 6).

Although Leslie and Richardson identified the Tax Commissioner as a major cause of the School District's financial woes, the School District itself faced public criticism over its financial status. Leslie's duties as superintendent included responding to the press on behalf of the School District. (Doc. 38 at 42:3-10). In September 2009, Leslie wrote a letter to the local newspaper to respond to an editorial and to correct a number of "misunderstandings" about the School District's decision to pay for lighting for its new athletic complex. (Doc. 38-1 at 11-13). One way Leslie defended the School District was by challenging the editorial's reference to its "multi-million dollar" athletic complex, which according to Leslie "was completed at a cost of approximately $2,781,742.74." (Doc. 38-1 at 11).

As the debate over the School District's finances intensified, an *Atlanta Journal-Constitution* reporter asked to interview Leslie and provided her with a list of questions he intended to ask. (Docs. 34 at ¶¶ 40, 41; 43 at ¶¶ 40, 41; 38 at 107:18-108:17). Before the interview, Leslie and the Board's attorney met to discuss these questions.

(Doc. 38 at 108:4-110:15). Leslie gave the interview accompanied by Richardson and other members of her leadership team. (Docs. 38 at 107:18-23; 38-1 at 46; 39-1 at 3). Richardson later informed the Board the "interview was held in reference to the millage rate [ ], local property taxes, budget, and the financial status of the Hancock County School System." (Doc. 39-1 at 3). Richardson also informed the Board that the Board's attorney "listened in on the interview and conferred with Dr. Leslie prior to her response to each question." (Doc. 39-1 at 3). The resulting *Atlanta Journal-Constitution* article, which was published on November 15, 2009, quotes Leslie as praising the School District's financial prowess and noting the impact of inadequate tax revenue on the School District's finances. (Doc. 38-2 at 1-3). For example, the article quotes Leslie as saying, "District expenditures are managed very well … . We manage every penny spent. It's easy to stand on the outside and look in and make all these allegations." (Doc. 38-2 at 2). The article also cites Leslie as saying the School District lost $1.4 million in "uncollected taxes," and county tax collectors did not properly seize and sell the properties of Hancock County property owners who did not pay their taxes. (Doc. 38-2 at 2).

In 2009, the Board began discussing suing the Tax Commissioner. (Doc. 38 at 116:2-6). On December 6, 2010, the Board approved Leslie's recommendation that it direct its attorney to file suit "requesting the Hancock County Superior Court to compel the Hancock County Tax Commissioner to collect the $2.3 million dollars in uncollected school taxes and fulfill his other legal duties."[4] (Doc. 38-2 at 18).

All members of the Board were up for re-election in November 2010. (Doc. 38 at 117:22-118:2). Leslie and Richardson both testified their continued employment was an

---
[4] The lawsuit was filed but was dismissed in September 2011. (Doc. 33-3 at ¶ 6).

issue during the Board elections.  (Docs. 38 at 117:22-119:4; 39 at 54:24-56:2).  According to Leslie, she knew she "was mentioned in the campaign discussions as stealing money."  (Doc. 38 at 119:2-3).  Richardson testified one of the major campaign promises was "to get rid of me and Dr. Leslie, who were making the high salaries, and other members in the administration who [were] making high salaries."  (Doc. 39 at 55:3-7).  All but one of the Board members were replaced, and one of the new Board members was the sister-in-law of the Tax Commissioner.  (Docs. 38 at 115:19-116:1; 42 at 6).  The newly elected Board took office in January 2011, and on January 29, the Board unanimously voted to remove Leslie from her position as superintendent, effective immediately.  (Docs. 38-2 at 19, 26; 51 at 12).  On February 2, 2011, the interim superintendent assigned Richardson to an administrative position and later assigned her to work as a first grade teacher.  (Docs. 39 at 95:20-23, 101:17-20; 39-1 at 7-9).  The School District contends it terminated and reassigned Leslie and Richardson for reasons other than their statements about the Tax Commissioner.  (Docs. 34 at 15-16; 53 at 8-9).  Neither Richardson nor Leslie spoke publically about the Tax Commissioner or his tax collection efforts following their termination and reassignment.  (Docs. 34 at ¶ 61; 43 at ¶ 61).

On December 19, 2011, Leslie and Richardson filed suit against the Board[5] and its members in both their official and individual capacities alleging that they had been terminated in retaliation for exercising their right to free speech under the First and Fourteenth Amendments, U.S. Const. Amends. I, XIV; 42 U.S.C. § 1983.  The

---

[5] The Plaintiffs initially filed suit against the Hancock County School Board of Education.  (Doc. 1).  They then moved to amend their complaint to substitute the School District for the Board.  (Doc. 13).  The Court granted the Plaintiffs' motion on August, 10, 2012, and the School District was substituted for the Board as the proper party.  (Doc. 18).

Defendants moved to dismiss for failure to state a claim and asserted the defense of qualified immunity for the individual defendants. The Court denied the motion to dismiss, but the Eleventh Circuit reversed as to the individual defendants, finding that their actions were protected by qualified immunity.[6]  *See Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1352 (11th Cir. 2013). The School District renewed its motion to dismiss, which the Court denied on January 27, 2014. (Doc. 29). The School District has now moved for summary judgment, arguing the Plaintiffs cannot establish they were speaking in their capacity as citizens.

## II.  DISCUSSION

### A.  Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels*

---

[6] The Eleventh Circuit's qualified immunity analysis turned on whether the law was clearly established that a public official could be held liable for retaliation against a policymaking employee for speech about policy. In its motion in this Court, the individual defendants argued that the Supreme Court's decisions in political affiliation cases, holding that a policymaker can be terminated based on political affiliation, made it unclear whether a policymaker could be constitutionally fired for her speech. *Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976). However, the Eleventh Circuit had not, and still has not, applied the so-called *Elrod-Branti* principle to speech retaliation cases. But the individual defendants argued that it would have been reasonable for them to assume that the Eleventh Circuit would apply *Elrod-Branti* to policymaker speech and thus they would have reason to think that they could have retaliated against the Plaintiffs for their speech. In effect, the individual defendants asked the Court to rely on law not yet established in the Eleventh Circuit but yet, they said, was sufficiently established to establish that no clearly established law protected the Plaintiffs' alleged public speech. This Court was not persuaded, but the Eleventh Circuit was. Noting that *Elrod-Branti* had been applied to speech cases in other circuits, the court held that it was not clearly established that the *Pickering* balance does not favor the government official as a matter of law when a policymaking employee speaks about policy. 720 F.3d at 1348.

*of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). But if the nonmoving party bears the burden of proof at trial, "the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party "simply may show … that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (internal quotation marks and citation omitted).

"Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Celotex Corp.*, 477 U.S. at 324). The non-moving party must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011). The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

**B. Analysis**

"The law is well established that a [public] employee may not be discharged in retaliation for speech protected under the First Amendment." *Vila v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007) (citing *Rankin v. McPherson*, 483 U.S. 378, 383 (1987)). However, "[Supreme Court] precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job." *Abdur-Rahman v. Walker*, 567 F.3d 1278, 1282 (11th Cir. 2009) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006)). The threshold question is whether the employee "spoke as a citizen on a matter of public concern." *Id.* at 1281-1282; *Vila*, 484 F.3d at 1339. If the answer is no, the employee has no First Amendment cause of action, and no further inquiry is necessary. *Garcetti*, 547 U.S. at 418.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014) (internal quotation marks and citations omitted). The Supreme Court has defined "speech made pursuant to an employee's job duties" as "'speech that owes its existence to a public employee's professional responsibilities'" and "a product that 'the employer itself has commissioned or created.'" *Abdur-Rahman*, 567 F.3d at 1283 (quoting *Garcetti*, 547 U.S. at 421-22). In *Garcetti*, the Supreme Court identified two relevant, yet non-dispositive factors: (1) whether the statements were made in the workplace or publicly and (2) whether the statements concerned the subject matter of the plaintiff's employment. 547 U.S. at 420-21. However, the Supreme Court has also stated:

> [T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.

*Lane*, 134 S. Ct. at 2379. Rather than rely on formal job descriptions, courts must conduct a "practical" inquiry to determine whether a statement owes its existence to an employee's professional duties for First Amendment purposes. *Abdur-Rahman*, 567 F.3d at 1283 (quoting *Garcetti*, 547 U.S. at 424). In the Eleventh Circuit, "[t]o determine whether [a] statement receives First Amendment protection … we look to the content, form, and context of a given statement, as revealed by the whole record." *Id.* (internal quotation marks and citations omitted).

### 1. Meetings at the Tax Commissioner's Office

The Plaintiffs first argue they "travelled away from their workplace to the Tax Commissioner's office, and spoke with him about the deficient tax collection rate." (Doc. 42 at 3). The Plaintiffs do not cite to specific instances of speech; rather, they argue generally that when they spoke about the Tax Commissioner's deficient tax collection rate at the Tax Commissioner's office, they spoke "just as citizens would have." (Doc. 42 at 4, 6). Because the Plaintiffs' "actual official duties" did not require them to report deficient tax collection rates, the Plaintiffs argue they went "beyond their dut[ies] to publicly rebuke the Tax Commissioner in a quest to [get] him to do his job." (Doc. 42 at 7). Thus, the Plaintiffs point to their travelling away from their workplace and speaking about publicly available information as proof they spoke as citizens.

Other than this general and conclusory argument, the Plaintiffs do not address the facts asserted by the School District.[7] It is undisputed that the School District had financial challenges and had identified low tax revenue as a source of its problems. Also, the School District itself faced public criticism over its financial status, and one way the School District dealt with this criticism was by shifting blame to the Tax Commissioner. To resolve the "obvious discrepancies in the accounting of funds between agencies," the Board directed Leslie to meet with the Tax Commissioner. (Doc. 38-1 at 40). Thus, the purpose of the Plaintiffs' meetings with the Tax Commissioner was to address the School District's position regarding the Tax Commissioner's fulfillment of his legal duties. (Docs. 38-1 at 40; 38 at 65:21-70:2; 39 at 29:10-31:7).

It is also undisputed that the Plaintiffs attended these meetings at the direction of the Board and were often accompanied by members of the Board and Leslie's leadership team. Both Leslie and Richardson reported to the Board about these meetings in their Friday letters. Finally, Leslie admitted she attended these meetings in her capacity as superintendent. (Docs. 34 at ¶ 32; 43 at ¶ 32). Richardson admitted she attended one of the meetings "as the superintendent" and "acted on behalf of" Leslie because Leslie had a prior engagement and was late. (Docs. 34 at ¶ 34; 43 at ¶ 34; 39 at 29:24-30:7, 32:6-12). Even when Richardson attended these meetings alongside Leslie, Richardson's duties as assistant superintendent included assisting Leslie in her duties as superintendent. (Doc. 39 at 20:16-24). By the Plaintiffs' own admissions and in light of the purpose of these meetings, the Plaintiffs' speech

---

[7] Indeed, the Plaintiffs largely admit the School District's statement of material undisputed facts. (Doc. 43).

regarding the Tax Commissioner's fulfillment of his legal duties was made pursuant to their official employment responsibilities.  *See D'Angelo v. School Bd. of Polk Cnty., Fla.*, 497 F.3d 1203, 1210-11 (11th Cir. 2007); *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 761 (11th Cir. 2006).  Accordingly, Leslie and Richardson were not speaking as citizens when they criticized the Tax Commissioner during these meetings.  *See D'Angelo*, 497 F.3d at 1210 ("[A] public employee who 'make[s] statements pursuant to [her] official duties … [is] not speaking as [a] citizen[ ].'" (quoting *Garcetti*, 547 U.S. at 421)).

      Notwithstanding the Plaintiffs' admissions, the Plaintiffs argue their *official duties* did not require them to report deficient tax collection rates.  However, this focus on formal job descriptions is misplaced.  "Formal job descriptions do not control the inquiry because they may 'bear little resemblance to the duties an employee actually is expected to perform … .'" *Abdur-Rahman,* 567 F.3d at 1283 (quoting *Garcetti*, 547 U.S. at 424-25).  Again, it is undisputed that the Plaintiffs attended these meetings in their capacity as employees for the purpose of discussing the Tax Commissioner's dereliction of duty and the consequences to the School District.  The fact that these meetings occurred away from the Plaintiffs' "workplace" does not, in this instance, suggest the Plaintiffs attended and spoke at these meetings as concerned citizens rather than as representatives of the School District.  Nor does the fact that the information the Plaintiffs spoke about was publically available alter the capacity in which the Plaintiffs spoke.  In these private meetings, the Plaintiffs were clearly discussing issues regarding the Tax Commissioner in their capacity as employees and on behalf of the School District.  *See, e.g.*, *Akins v. Fulton Cnty., Ga.*, 278 F. App'x 964, 971 (11th

Cir. 2008) ("[T]he pithy inquiry here is … whether they made their statements to the commissioner as citizens who do not work for the government."). Therefore, any speech critical of the Tax Commissioner made during these meetings was made "for the purpose of fulfilling [the Plaintiffs'] assigned job duties," "owe[d] [its] existence … to [the Plaintiffs'] official responsibilities[,] and cannot reasonably be divorced from those responsibilities." *Abdur-Rahman,* 567 F.3d at 1283 (internal quotation marks and citation omitted).

### 2. The *Atlanta Journal-Constitution* Interview and Article

Leslie argues she was acting as a citizen "seeking to right a public wrong" when she communicated her concerns about the Tax Commissioner's deficient tax collection rate to the "largest daily newspaper in Georgia." (Doc. 42 at 4). She again argues she went beyond what her official duties required when she "publicly rebuke[d] the Tax Commissioner in a quest to get him to do his job." (Doc. 42 at 6-7).

Leslie admitted that working with the press was one of "the ordinary duties of every superintendent," and more specifically, she admitted she was acting as superintendent when she met with the *Atlanta Journal-Constitution* reporter and answered his questions. (Docs. 34 at ¶ 43; 43 at ¶ 43; 33-7 at 3; 38 at 41:24-42:10, 107:24-110:15). The Board's attorney reviewed and discussed the interview questions with Leslie prior to her responses, and Leslie gave the interview accompanied by other School District employees. The article itself reveals that Leslie answered the reporter's questions not as a citizen, but on behalf of the School District. Leslie delivered the School District's calculated message that though it aptly managed expenditures, it lost money due to uncollected taxes. Therefore, Leslie's statements regarding the Tax

Commissioner during the interview were not made in her capacity as a citizen but were made pursuant to her official employment responsibilities. *Adbur-Rahman*, 567 F.3d at 1283; *see also Battle*, 468 F.3d at 761; *D'Angelo*, 497 F.3d at 1210-11.

### 3. Statements at Public Meetings

Finally, the Plaintiffs argue, again generally, they "made statements in forums that included public meetings." (Doc. 42 at 3). But, neither Leslie nor Richardson identify any specific public meetings or any specific statements made at such meetings in their response to the School District's motion for summary judgment. The only public meetings identified in the Plaintiffs' discovery responses are Hancock County Board of Education meetings, including School Board meetings, SPLOST hearings, millage rate hearings, a tax hearing, and a strategy planning meeting. (Doc. 52 at 5-8). Because the Plaintiffs "claim no protection for speech uttered to their supervisors on the Hancock County Board of Education or within their offices," the Defendant argues the Plaintiffs do not seek protection for any speech made during these meetings, which the Defendant considers occurring in the Plaintiffs' "workplace." (Docs. 42 at 3; 53 at 2 n.3). In any event, the Plaintiffs have not identified any statements made at "public meetings" that they claim were protected by the First Amendment. Nor has the Court found any in the record. Rather, as discussed above, all speech by the Plaintiffs about the Tax Commissioner and local taxes was made as a part of their official responsibilities.

### III. CONCLUSION

The Plaintiffs have failed to show that the statements they claim First Amendment protection for were made in their capacity as citizens. Accordingly, the

Plaintiffs have failed to surmount the threshold inquiry.[8]  *See Abdur-Rahman*, 567 F.3d at 1281-82.  The Defendant has shown that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Therefore, the Defendant's motion for summary judgment (Doc. 33) is **GRANTED**.

      **SO ORDERED**, this 5th day of February, 2015.

                                        S/ Marc T. Treadwell
                                        MARC T. TREADWELL, JUDGE
                                        UNITED STATES DISTRICT COURT

---

[8] The Plaintiffs attached an affidavit to their brief in response to the Defendant's motion for summary judgment.  (Doc. 42-2).  The Plaintiffs rely on the affidavit as evidence that the Plaintiffs' speech was a substantial motivating factor for their termination.  (Doc. 42 at 11).  The Defendant argues the statement in the affidavit is inadmissible because it is authored by an individual whom the Plaintiffs did not identify in their Rule 26 initial disclosures or in response to the Defendant's interrogatories.  (Doc. 53 at 9).  "Unless the failure was substantially justified or harmless," Rule 37(c)(1) prohibits a party from relying on a witness to supply evidence on a motion if the party failed to identify the witness as required by Rule 26(a) or (e).  Because the Plaintiffs failed to surmount the threshold inquiry, the Court need not consider the admissibility of the statement in the affidavit.